UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| BRUCE MODICUE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:22 CV 174 SNLJ |
| | ) |
| SOUTHWESTERN BELL | ) |
| TELEPHONE COMPANY, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM and ORDER

Plaintiff Bruce Modicue filed this lawsuit against his employer, defendant Southwestern Bell Telephone Company ("SWBT"), claiming that he had suffered discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*. This matter is currently before the Court on defendant's Motion for Summary Judgment [Doc. 21]. The motion has been fully briefed and is ripe for disposition.

**I.  Factual Background**

The following facts are undisputed except where indicated.

Plaintiff worked at defendant's call center in Cape Girardeau, Missouri, as a Leveraged Service Representative. The terms and conditions of plaintiff's employment were governed by a collective bargaining agreement ("CBA") between SWBT and the Communications Works of America ("CWA"). Leveraged Service Representatives such as plaintiff handle business transactions with AT&T customers, including accessing

1

account information, telephone correspondence, and collection of work orders.  Plaintiff thus had access to personal and confidential customer information, such as customers' credit card information, Social Security numbers, and home addresses.  The call center where plaintiff worked was in an enclosed four-story building with common areas, including the lobby, hallways, restrooms, stairwells, and elevators.  Leveraged Service Representatives worked in adjacent cubicles with managers nearby. Leveraged Service Representatives reported to Sales Coaches, who in turn reported to the Center Sales Manager.  Plaintiff Modicue reported to Sales Coaches Catherine Bareiter and Kent Deason at different points, and those Sales Coaches reported to Center Sales Manager Anthony ("Tony") White. Jennifer Gierse served as the Field Attendance Administrator (commonly referred to as the "Attendance Manager") for Cape Girardeau during plaintiff's employment. Another SWBT call center, with different Sales Coaches and a different Center Sales Manager, was in the same building as the call center where plaintiff worked.

On March 11, 2020, the World Health Organization declared COVID-19, the disease caused by novel coronavirus SARS-CoV-2, a global pandemic.  As of March 2020, SWBT and the CWA had not agreed on terms and conditions for Leveraged Service Representatives to work from home.  Plaintiff was permitted to take excused time off between March 17, 2020 and May 15, 2020, including paid excused absence time and paid vacation days.  On May 4, 2020, the Cape Girardeau County Public Health Center ("PHC"), along with Cape Girardeau County and municipalities within the county,

2

instructed individuals to wear a mask in public places and instructed businesses to follow OSHA's rules, regulations, and guidelines designed to protect workers from COVID-19.

Defendant SWBT distributed its face covering requirements to call center employees on June 18, 2020.  It stated that everyone must wear a face covering when inside any building in the presence of another person unless six feet of social distance could not be maintained.  Employees were specifically required to wear a face covering when entering, exiting, or otherwise outside of a personal workspace inside a building. SWBT invited employees who could not wear a face covering due to an underlying medical condition or religious belief to request an accommodation. On July 13, 2020, the Cape Girardeau PHC issued an Emergency Face Covering Order ("Face Covering Order") requiring businesses to enforce the requirement that anyone over age nine to wear a face covering inside any public place or business.  The Face Covering Order further provided that "[a]ll Businesses must follow any additional requirements as determined by general and business-specific operating standards, guidelines and/or protocols published by OSHA, NIOSH, CDC or other federal or state agencies."

On November 9, 2020, defendant SWBT issued Updated Guidelines for Employees on Face Coverings; it required employees to wear face coverings at all times while inside a Company building, including while on a call at their personal workspace in a call center. The November 9, 2020 Face Covering Policy announcement invited employees who could not wear a face covering due to an underlying medical condition or religious belief to request an accommodation.

3

The requirement to wear a face covering at all times inside the Cape Girardeau call center remained in place throughout the remainder of plaintiff's employment. Defendant states that plaintiff admitted that he did not know of any individual who was permitted to work in the Cape Girardeau call center without a face covering in 2020, but plaintiff responds that in fact plaintiff could not remember any such names off the top of his head. He says that at least two Caucasian employees—Dustin Whitaker and DeeDee Whitaker—were provided reasonable accommodation while plaintiff, who is African American, was not.  However, plaintiff admits that Dustin Whitaker was disciplined for refusing the wear a face covering and that DeeDee Whitaker worked at a different call center and had a different chain of command.

On June 25, 2020, plaintiff submitted a Religious Accommodation Request asking that he be allowed to come to work in the call center without a face covering.  Plaintiff indicated that the face covering requirement "goes directly against my religion" based on "1 Corinthians 11:7 (Holy Bible) 'For a man shall not cover his face/head for he is the image and glory of GOD.'"  Plaintiff and defendant had repeated discussions regarding the accommodation of his request that would also allow for the protection of the health and safety of other employees. Plaintiff's union representative was present during many of these discussions.  On June 30, 2020 plaintiff made clear his request to come to work without a face covering was a permanent request, and that he would not wear anything on his face, including mask alternatives such as a bandana, scarf, or face shield. The Company determined that allowing an employee to work in the call center without a face

4

covering was not an option in light of health risks and local directives.  Although plaintiff sought the ability to work from home, defendant did not have security protocols in place to protect the sensitive customer information that would allow Leveraged Service Representatives to work outside of the call center.

Defendant contends it offered plaintiff paid vacation or an unpaid excused leave of absence as accommodations. Plaintiff counters that defendant's representative Catherine Bareiter tried to cajole plaintiff into coming back to work and wearing a mask, and plaintiff further states that such offers of leave cannot be considered "accommodations." Regardless, plaintiff chose to take the unpaid but excused leave of absence accommodation. Plaintiff was absent, with the Company excusing his absence, for the entire month of July 2020.  SWBT then allowed plaintiff to extend his leave of absence throughout the remainder of 2020, but plaintiff was not paid, and his requests to work from home were denied.

During that period, on August 4, 2020, plaintiff also submitted a request for an accommodation to be exempt from wearing a face covering because he stated that wearing a mask triggered his anxiety, resulting in sweating and the inability to concentrate. The parties dispute whether plaintiff provided medical documentation of a disability.  Defendant states that plaintiff's healthcare provider certified that plaintiff did not have any disorder, condition, disability, or functional limitation that impacted any major life activity, and he did not identify any limitations possessed by plaintiff.  Plaintiff states that in fact, Dr. Wong, on August 5, 2020, examined and filled out an

accommodation request form, wherein Dr. Wong indicated plaintiff had a serious, chronic health condition, and that he was unable to wear a mask due to anxiety. [Doc. 22-10.]

Eventually, defendant SWBT and the union, the CWA, negotiated an agreement for temporary and limited participation in the Flexible Workspace Program, which would allow approved union employees to perform their duties from home under the terms of the agreement. On or about December 7, 2020, during plaintiff's leave of absence, Gierse called plaintiff to advise him that the option to work from home had become available as an alternative to working in the call center in person. Gierse advised plaintiff that an initial in-office setup of his equipment was required to enable him to enable him to work from home, and that plaintiff would need to briefly wear a face covering to enter and exit the building before and after setting up his equipment in the training room. Gierse explained to plaintiff that he would be permitted to remove his mask while he was in the training room setting up his equipment. Plaintiff refused to briefly wear a face covering to enter and exit the building and to enter and exit the training room to complete the required in-person setup of his equipment to enable him to work from home.

On January 7, 2021, Gierse again called plaintiff to advise him that the option to work from home was available to him. Gierse again advised plaintiff that an initial in-office setup of his equipment was still required to enable him to work from home, and that he would still need to briefly wear a face covering to enter and exit the building before and after setting up his equipment in the training room. Gierse again offered to

6

allow plaintiff to remove his mask while he was in the training room. Plaintiff again refused to briefly wear a face covering to enter and exit the building and to enter and exit the training room to complete the required in-person setup of his equipment to enable him to work from home.

Defendant SWBT again approved plaintiff for a leave of absence/vacation time through February 2021 to accommodate his stated inability to wear a mask.

On January 27, 2021, Gierse called plaintiff to advise him that his managers made preparations to bring plaintiff's work equipment outside the building for him, and defendant created a virtual set-up process for plaintiff so he would not need to come into the building with a face covering.

Defendant SWBT provided plaintiff with a Company laptop and phone, which were the necessary equipment to begin working from home. During plaintiff's scheduled tours, he was permitted to log into defendant's systems and conduct calls. While working from home, plaintiff was required to communicate any issues with his equipment immediately.

Plaintiff returned to work (from home) on February 1, 2021. Defendant states, however, that plaintiff was chronically absent, missing 145.75 hours of work between February 3, 2021 and March 25, 2021 unrelated to any purported disability. Plaintiff states that he was not absent by choice and that, rather, he was not allowed to log into his work computer for those hours during these dates. However, plaintiff also admits that his homelife was no longer conducive to working from home.

7

On March 27, 28, and 29, plaintiff did not call out, did not log in, and did not perform any work duties.

On March 29, 2021, Gierse asked plaintiff the reason for his absences on March 28 and 29. Plaintiff texted Gierse his reason for not performing work:

> Long story short I have people that moved in with me because they have no where [sic] else to go and I am letting them have the room where I work for not [sic]. There are several kids and work from home isn't going to work for me at this time, what options do I have at this point?

Gierse asked if he could "move [his] computer into [his] own room to work since the other room is now occupied," and plaintiff responded "No." Gierse asked plaintiff to confirm that he still would not wear a face covering and come into the office. Plaintiff stated he could not wear a mask.

Plaintiff did not work on March 30, 2021, his next scheduled shift, but he says that he was not permitted to log in. He also did not call out, log in, or perform any work on April 2, April 3, or April 5. Defendant SWBT coordinated with plaintiff's union representative so a call could be scheduled among plaintiff, his union representation, and management. The call was scheduled for Tuesday April 6, 2021 at 3:00 p.m.. Gierse informed plaintiff of the time and how to dial-in for the call and texted him on the day of the call to remind him and make sure he was available.

Modicue responded: "Hey- this is what I just sent to Jeanne[:] So is that a 'no' to emailing me the options and to me accessing the computer provided to me to access those emails?"

8

Plaintiff explains that he preferred written communication to a live meeting because he states he had been pressured to wear a mask when engaging in live communications. Indeed, plaintiff did not join the call. His managers scheduled another call for April 7. Plaintiff again refused to join the call. During this time, plaintiff again did not log in, call out, or perform any work. Plaintiff emailed his managers and union representative that he was "willing to correspond with everyone via email" and that he preferred written communication over emails. Plaintiff's managers preferred a live call so they could have an interactive discussion to best determine how to return him to work. Plaintiff still preferred email because he did not want to feel pressured to wear a mask. An April 12 call was scheduled, and plaintiff was advised that failing to attend the call would be considered in subordination and could result in termination. Plaintiff again failed to show up for the call. He also failed to work, log in, or call out during this period. His employment was terminated on April 19, 2021 for his refusal to work and insubordination. The union chose not to challenge the termination. Notably, although plaintiff says he was unable to log in to defendant's systems to work, he was able to send the above-described emails.

Plaintiff filed this lawsuit alleging discrimination based on religion, race, and disability on December 28, 2022.

**II.    Standard of Review**

Pursuant to Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment

9

as a matter of law." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467 (1962). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Assoc. Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976). "Where parties file cross-motions for summary judgment, each summary judgment motion must be evaluated independently to determine whether a genuine issue of material fact exists and whether the movant is entitled to judgment as a matter of law." *Martin v. United Collections Bureau, Inc.*, No. 4:14-CV-804-JAR, 2015 WL 4255405, at *2 (E.D. Mo. July 14, 2015) (citing *Husinga v. Federal–Mogul Ignition Co.,* 519 F.Supp.2d 929, 942 (S.D. Iowa 2007)). "[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits." *Wermager v. Cormorant Township Bd.,* 716 F.2d 1211, 1214 (8th Cir.1983). In

determining the appropriateness of summary judgment, "the relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Bingaman v. Kansas City Power & Light Co.,* 1 F.3d 976, 980 (10th Cir.1993) (quoting *Anderson,* 477 U.S. at 251–52)).

### III. Discussion

Defendant seeks summary judgment on all three of plaintiff's discrimination claims.

#### A. Religion

Plaintiff claims defendant discriminated against him on the basis of his religion when defendant did not allow him to work without a mask and when it did not let him work from home promptly. To establish a *prima facie* case of religious discrimination for failure to accommodate under Title VII, Modicue must prove he: (1) held a bona fide religious belief that conflicted with an employment requirement; (2) informed SWBT of his religious belief; and (3) was disciplined for failing to comply with the conflicting requirement. *Jones v. TEK Indus.*, 319 F.3d 355, 359 (8th Cir. 2003). If he establishes his *prima facie* case, the burden shifts to SWBT to show that it provided a reasonable accommodation or that providing an accommodation would result in undue hardship. *Seaworth v. Pearson*, 203 F.3d 1056, 1057 (8th Cir. 2000).

Plaintiff alleges he holds a sincere religious belief in Christianity and that, as a result, he cannot wear a face mask. Plaintiff cites to a Bible verse he follows, which he states makes wearing a facial covering, including masks, to be against his religious belief. He told defendant that he wanted to work at the call center without a face covering in

11

light of his religious belief. He refused to accept another option such as wearing a clear face shield, and he also made clear that his request to not wear a face covering was permanent.  Defendant states that it accommodated plaintiff by providing plaintiff with approved time off from the date of his request until February 1, 2021. Plaintiff accepted that accommodation.

Plaintiff has not shown, as he must, that he was disciplined for his refusal to wear a mask. *See, e.g.*, *Jones v. TEK Indus., Inc.*, 319 F.3d 355, 359 (8th Cir. 2003).  *Jones* affirmed judgment in favor of a defendant where plaintiffs did not show they were disciplined for failure to comply with an employment requirement that conflicted with their religion. *Id.*  Instead of showing he was disciplined for refusing to wear a mask, plaintiff argues that defendant did not promptly or reasonably seek the work-from-home option or provide another route for plaintiff to perform his duties in, e.g., a secluded area in the call center.  Defendant was not required to supply either of those options, however. The Eighth Circuit has held "that an employer is not required to accommodate an employee based on the employee's preference." *Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177, 1183 (8th Cir. 2019).  Notably, defendant did offer plaintiff a work-from-home option after negotiations with the union for a work-from-home policy that included required security measures.  Further, defendant has shown that a "secluded" environment in which plaintiff could not wear a mask (which would have been a violation of government regulations) was unavailable.  Defendant also offered plaintiff the opportunity to wear a clear face shield.

12

Plaintiff was ultimately terminated for failing to work from home after he became able to work from home in March 2021.  He does not argue that his termination was due to his failure to comply with the mask requirement. Plaintiff does argue that defendant failed to engage in an interactive dialogue with plaintiff and that instead defendant relied on canned talking points; however, plaintiff cites to no authority for his assertion that the use of prepared notes for employee accommodation meetings presents a prime facie case of bad faith.  Plaintiff contends defendant "failed to provide any other options" [Doc. 24 at 7], but defendant has exhaustively shown that it attempted to work with plaintiff and engage in an interactive dialogue on acceptable alternatives to face masks, permissible leave options, and ultimately a work-from-home option.  Plaintiff says he felt "pressured" to wear a face mask, but it is apparent that defendant worked diligently to offer him options while merely emphasizing that he would be required to wear a face covering if he returned to the call center.  Plaintiff was repeatedly offered leave (which he accepted), and he was also offered also the option to wear a clear face shield in lieu of a mask.

Defendant will be granted summary judgment as to plaintiff's religious discrimination claim.

**B. Disability**

The burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), applies to plaintiff's ADA claims.  To state a *prima facie* case of disability discrimination, plaintiff must prove that he: "(1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) has suffered an

13

adverse employment action because of [his] disability." *Shklyar v. Carboline Co.*, 616 F. Supp. 3d 920, 923 (E.D. Mo. 2022) (quoting *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013)). If plaintiff proves each element, the burden shifts to SWBT to articulate a legitimate, nondiscriminatory reason for its action. *Nesser*, 160 F.3d at 445 (citing *Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1072 (8th Cir. 1998)). "If the employer meets this burden, the plaintiff then bears the burden of demonstrating that the employer's stated reason is a pretext for discrimination." *Id.*

Defendant contends plaintiff's claim fails first because he cannot show he has a disability as defined by the ADA.  Under the ADA, a disability is "a physical or mental impairment that substantially limits one or more of that person's major life activities." *See Shklyar*, 616 F. Supp. 3d at 924. Defendant points out that plaintiff's physician certified that plaintiff did not have any physical impairment, mental impairment, or any functional limitation that would substantially limit any major life activities. Indeed, plaintiff's physician Dr. Gemo Wong filled out an "ADA Accommodation Medical Evaluation Form" for plaintiff [Doc. 22-10].  In Section "Q3. Physical or Mental Impairment," the form asks "Does the employee have a physiological disorder or condition…that affects one or more of the body systems…?" and "Does the employee have any mental or psychological disorder or condition, such as intellectual disability, organic brain syndrome, emotional or mental illnesss…?"  Plaintiff's physician circled "No" as the answer to both.

14

The instructions on the form state that, if the doctor answered "No" to the Q3. Physical or Mental Impairment questions, then the doctor should skip to the last page of the document and sign and date the form. However, plaintiff's doctor did not skip to the last page.

The form's next section is titled "Q4. Functional Limitations." It asks, "Do these functional limitations substantially limit the Employee as compared to an average person in the general population in his/her ability to perform any major life activities….or the operation of a major bodily function…?" The physician answered "No." Despite answering "No," the doctor further opined that the "Frequency and duration of the limitation(s)" were "chronic" and "as long as masks are required."

The form's next section is titled "Q5. Essential Job Duties." The form asks, "Do the functional limitation(s) prevent the employee from performing some or all of the employee's essential job duties…?" The physician answered "Yes" and that plaintiff "cannot perform due to anxiety when required to wear mask." Under "Q6. At Work Accommodations," the physician recommends "at work" accommodations that would allow the employee to perform his essential job functions. Those recommendations are "no mask --- special accommodation to allow for social distancing."

Thus, to summarize, despite opining that plaintiff suffered "No" physical or mental impairments and "No" functional limitations, Dr. Wong stated that plaintiff's limitations mean that he "cannot perform due to anxiety when required to wear mask." [Doc. 22-10 at 2-4.] Oddly, in another document titled "Certification of Health Care

15

Provider for Employee's Serious Health Condition" dated July 31, 2020, Dr. Wong apparently checked both "No" and "Yes" as the answer to "Does the patient's condition qualify as a 'Serious Health Condition' under FMLA?" [Doc. 26-3 at 3.]

Plaintiff's evidence supporting that he has a "serious health condition" sufficient to trigger the ADA is thus frustrating and highly suspect. Plaintiff, without recognizing the patent contradictions inherent to both documents, blithely asserts that a "close" look at both forms suggests plaintiff is unable to wear a mask due to anxiety.  It is difficult to say that plaintiff could carry his burden of proof on this matter, but, even so, it is apparent that plaintiff's ADA claim fails on the second and third elements.

The second element of an ADA claim requires that plaintiff show he was qualified to perform the essential functions of his job. Consistent or excessive absences establish that a plaintiff is not a "qualified individual" under the ADA. *Kinnaman v. Ford Motor Co.*, 79 F. Supp. 2d 1096, 1102-03 (E.D. Mo. 2000). Defendant argues that the evidence shows plaintiff did not perform the most basic essential function of his job, which was showing up.  Plaintiff did not log in, call in, or perform any work between March 27 and April 17, 2021.  Thus, plaintiff can not prove he is a qualified individual.  Although plaintiff alleges he was not allowed to log in to his work computer, he admits that he was permitted to log in to defendant's systems and perform his work during his scheduled shifts.  Defendant explains that employees are only able to access company systems during their scheduled shifts.

16

The third element of an ADA claim requires that plaintiff show defendant took an adverse employment action because of his disability. Plaintiff argues he meets this requirement because "all actions were taken against Mr. Modicue after his second reasonable accommodation request, which was in regards to his disability." [Doc. 24 at 10.] Plaintiff complains that, for example, he asked for his "meeting" with his supervisor and his union representative to occur over email, but he says that "accommodation request" was denied. It is not clear how requiring plaintiff to meet over the phone instead of over email was an "adverse employment action" or even a failure to accommodate—plaintiff did not seek to meet over email for reasons of his disability. Further, it is undisputed that, after plaintiff stated he was unable to wear a face covering, defendant accommodated by providing approved time off until the work from home option was established. Providing such approved time off does not constitute discrimination, and plaintiff does not even appear to argue that it did. *See Beloate v. Dejoy*, No. 5:22-CV-06037-DGK, 2023 WL 6449445, at *4 (W.D. Mo. Oct. 3, 2023).

The only adverse employment action alleged by plaintiff is that he was terminated after failing to perform any work from March 27, 2021 through the date of his discharge on April 19, 2021. He was discharged only after he failed to attend a phone meeting that was scheduled and rescheduled three times. To the extent plaintiff argues that defendant's reasons for his termination—failure to work and then failure to even appear for three required meetings to discuss his failure to work—are pretext, plaintiff offers no evidence in support. Plaintiff, despite telling this Court that he could not work

17

because he was locked out of defendant's systems, told his employer that his circumstances had changed such that working from home was no longer possible for him. Plaintiff admits that he was able to log into defendant's systems during his scheduled working time.  [Doc. 25 ¶ 87.] Further, plaintiff used his company email to tell his supervisor that he wanted to meet via email and not by phone conference, contravening his argument that he was somehow locked out of his workstation.  There is no dispute about these material facts, and thus defendant is entitled to summary judgment on plaintiff's ADA claim.

### C.  Race

The *McDonnell Douglas* framework also applies to race discrimination claims. *Tina Grant v. City of Blytheville*, 841 F.3d 767, 773 (8th Cir. 2016). For plaintiff to establish a prima facie case of race discrimination, he must show proof that he (1) is a member of a protected class, (2) was qualified, (3) suffered an adverse employment action, and (4) can provide facts that give rise to an inference of unlawful race discrimination.  *Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 700 (8th Cir. 2006).  If plaintiff carries his burden of establishing a *prima facie* case, the burden then shifts to defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. If defendant does so, then plaintiff must show pretext.

The parties dispute only whether plaintiff can provide facts that give rise to an inference of unlawful race discrimination.  Plaintiff, an African American, must prove that defendant committed an adverse action under circumstances that imply race

discrimination by, for example, showing more favorable treatment of similarly-situated employees who are not in the protected class. *Tina Grant v. City of Blytheville*, 841 F.3d 767, 773 (8th Cir. 2016). "Similarly-situated" employees are those who had the same supervisor and received better treatment despite engaging in the same conduct as the plaintiff under the same circumstances. *Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 938 (8th Cir. 2019).

Defendant terminated plaintiff's employment after he did not report for work for weeks and refused to attend three separate meetings with management and his union. Plaintiff asserts that two white employees, Dustin and Dede Whitaker, were allowed to enter the call center without a mask. However, Dede Whitaker reported to a different supervisor under a different center sales manager. Dustin Whitaker reported to the same center sales manager as plaintiff, but defendant held Dustin Whitaker to the same requirements, offered him the same options to take excused time off work, and disciplined him when he entered the workplace without a mask. Plaintiff offers no admissible evidence to support that similarly-situated white employees were treated better than he was. He cites to a former coworker's declaration to support that "other individuals who were provided work from home positions were treated better than" plaintiff. [Doc. 28 ¶ 26.] However, that declaration is vague and provides no detail about who or how anyone—let alone anyone similarly situated—was treated differently from plaintiff. The evidence shows that plaintiff repeatedly failed to log in to work from home after he was given the opportunity. He explained that his home environment was no

19

longer conducive to doing so. Plaintiff's evidence fails to show that defendant committed an adverse action under circumstances that imply race discrimination. Defendant will be granted summary judgment on plaintiff's racial discrimination claim.

### IV. Conclusion

Defendant's motion for summary judgment will be granted.

Accordingly,

IT IS HEREBY ORDERED that defendant Southwestern Bell Telephone Co.'s Motion for Summary Judgment [Doc. 21] is GRANTED.

Dated this  19th   day of July, 2024.

_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE